et al., and 141598 Hyannis Marina Inc. v. Anne Berwick et al. I hope the last two cases have convinced all of you that it is simply the life of a lawyer to deal with complex, long, ongoing litigation. You already know that. Mr. Price, proceed. Your Honor, I may have pleased the Court. My name is Matthew Price on behalf of Appellants. If I may reserve two minutes for rebuttal, please. You may. Thank you. An action is properly brought under ex parte young if two conditions are met. First, a complaint must allege an ongoing violation of Federal law, and second, the complaint must seek prospective relief. Counsel, if I may offer some advice. At least I have some doubt that the District Court was correct on ex parte young. I'm not saying don't argue it, but I have a higher priority, and my higher priority has to do with whether there are alternate grounds that are evident from the record that this action does not constitute either a supremacy clause, a viable clause of action, or a viable dormant commerce clause of action. So perhaps if you could deal with the issues that concern me and perhaps other panel members first, and then come back to the ex parte young. Absolutely, Your Honor. I'd be happy to. Thank you. So with respect to the preemption issue first, the basic, I guess I make three points with respect to the preemption issue. The first is that the Federal Power Act establishes a clear line between wholesale sales and retail sales of electricity. Wholesale sales are devoted to the exclusive regulatory jurisdiction of FERC, and states are prohibited from intruding into that field in any respect. And in New England, FERC has decided that wholesale electricity sales should take place under a market-based system of regulation where parties voluntarily and freely negotiate contracts with one another and sell their power in the marketplace in that manner. And so a state action which compels a wholesale transaction that would never have taken place absent the state's coercive entrance into that field both conflicts with FERC's policy and also intrudes into a field that Congress is reserved. What is the compulsion that you have identified here? Well, the compulsion that we identify in the complaint and in the fact that, as we allege, NSTAR had resisted for many years entering into any kind of arrangement with Cape Wind. It then sought to merge with a Connecticut-based utility, and the state used its leverage over the merger process to force NSTAR into a contract that NSTAR previously had no interest in entering. But, yeah, that allegation is clear, but is there anything about the nature of the power purchase agreement that somehow intrudes into FERC's power authority over wholesale rates? If you're complaining about the power purchase agreement  and you're saying that the state compulsion argument that you've just made is put aside, is there anything else about the structure of this transaction that you would say violates the supremacy clause? I think I understand Your Honor's question. The answer is that it is the state compulsion that we allege that gives rise to the preemption problem. In absent state coercion, the state hasn't done anything that would enter the field that is prohibited to it. So the state coercion is critical. Let me ask you about the coercion, because that argument was made to the DPU, and the DPU specifically found, to the contrary, as a matter of fact, that there was no requirement that they enter into the contract. If you'd appealed that to the Massachusetts Highest Court, you would have been subject to a substantial evidence test for that fact-finding. Is it your position now that by instead collaterally attacking it in the federal court, you get a de novo review of the DPU's decision that there was no compulsion? Well, I do think we get a de novo review of that decision. Let me explain, because only one of the four appellants here was even present and participated in that DPU proceeding. Yes, but that's approaching it from the point of view of sort of res judicata, which is not what concerns us. Continue with your answer to Judge Kayada. Well, my understanding of the case law is that a federal court that's reviewing a constitutional claim under Ex Parte Young does not defer to the fact-finding of the state agency whose finding is being adjudicated by the federal court. And you note that some of the plaintiffs here weren't parties to that, okay? Suppose we agree with you, and you go and you try this case, and then at the end of the case, the fact-finder reaches the same decision the DPU did and finds no compulsion. Could three other rate payers, who aren't in this case, file an action the next day and say, now we won our shot at it, and so on for a thousand times until finally someone wins? Well, at that point, Your Honor, there would be a stare decisis effect of that decision. On the fact-finding? On the fact-finder, if that's correct. So when we apply stare decisis to a fact-finding by a court, why wouldn't we apply stare decisis to a fact-finding by a Massachusetts agency to the extent that the Massachusetts courts would do so? Well, because the Massachusetts agency's fact-finding has never been reviewed by a court. But that's because of a decision by one of your clients, the Alliance, which chose not to take an appeal. The remaining plaintiffs who are now appellants in this court were not part of that proceeding and couldn't have taken an appeal. But, Your Honor... They could have participated in the proceeding. I'm sorry, pardon me, Your Honor? They could have participated in the proceeding. That's what we have these... The whole issue is Massachusetts, through its sovereign government, has set up an agency to review these contracts to make sure they're proper, including to hear arguments like you're making to us. Some of you entered into it and lost. Others stood by the sidelines. Now you want us to hold fresh dark. But we're bringing a federal claim, Your Honor, and federal courts have jurisdiction to hear federal claims. The plaintiffs bringing a federal claim to a federal court are not the plaintiffs. They're the plaintiffs. The state agency reached this decision about one of the factual predicates of the federal claim. And the preclusion cases they rest upon all deal with situations in which the state agency was acting in an adjudicatory capacity, which traces back to the University of Tennessee v. Elliott case decided by the Supreme Court. A rate-making proceeding of the kind the DPU engaged in that resulted in this order is not an adjudicative process in the same way. It's a legislative process. It's a fixing of rates prospectively. That's a legislative process. It's not an adjudicative process where the court is adjudicating claims between two... Well, except that the alliance raised before the agency this supremacy claim specifically made the same argument that you just made. The state interfered here and compelled the power company to do something it didn't want to do. And they engaged in fact-finding. So it seems as though it were a hybrid procedure. They accepted NSTAR's statement that they were not coerced, and they actually found no coercion. So earlier I referred to Iqbal, and it makes me wonder when we have this finding, whether it's plausible, your claim that it's plausible that there was coercion, which has been rejected by the state agency, and that whether it can be plausible. Well, I think it is plausible, your Honor, and the reason for that is that the rationale that was given by the DPU is that NSTAR had come to recognize the value of contracting with Cape Wind for its rate payers and so forth. Cape Wind offered unique value. But as a matter of fact, the memorandum of understanding between NSTAR and the DOER, and also the contract between NSTAR and Cape Wind, were all expressly conditioned on approval of the merger. If it were really true that NSTAR had come to this sudden understanding that actually this was a fantastic idea- No, no. I doubt that's NSTAR's position. And that isn't our question. Our question is, did the state so interfere in the process as to coerce? And they say, look, this agency, Energy Environmental Agency, DOER, just doesn't have the power to do that, so you start there. And your response is, well, they may not have the authority, but by God, they pulled it off anyway. And therefore, it's a fact question. But federal courts have to show some respect to the operation of the state agencies. And as Judge Kayada has pointed out, even if you've gone for review there, it's substantial evidence review. You've told us, oh, no, that can't matter to a federal court. It would be de novo review. Well, I'd suggest, Your Honor, that whatever the appropriate standard of review is with respect to this finding by the DPU, that shouldn't result in the dismissal of the complaint at the pleading stage, where we have alleged facts. And if you draw the reasonable inferences from the facts that we've alleged, as one must at the motion-to-dismiss stage, we've stated a plausible case of coercive interference by the state. But doesn't it suggest the reason why ratepayers shouldn't have standing to make these type of claims when there is a tribunal set up in Massachusetts where the ratepayers can go and make exactly the arguments we want? If I understand it, this contract doesn't become effective, and no one will be charged a penny under it unless FERC finds the rates just and reasonable. In other words, the file tariff doctrine will still apply. You have to have the contract filed. And you can appear in a FERC proceeding and say, well, we think it was compelled. And if you win there, the contract's gone, right? Well, the substance of our claim, Your Honor, is not that the rates are unjust and unreasonable. The substance of our claim is that the state has intruded into the federal field by taking action to coerce a contract that it shouldn't have. Well, but to the extent FERC is relying on market-based rate authority, it's relying on an assumption of voluntary contract. So you would argue that this was an abuse of market-based rate authority, and you'd go to FERC and you'd argue it. And you want us to be like, no matter what these two agencies do, any rate payer can come in and have a de novo review of fact-finding. I also can't fathom where you'd get stare decisis out of fact-finding. So it seems to me it would necessarily follow that any rate payer at any time could just stand on the sidelines and then start another case. I understand, Your Honor. My point is just that when there's been a fully litigated, a fully discovered decision before the federal court adjudicating the federal claim, other rate payers are likely to resolve that, regard that as over. And there's also statute of limitations. Here, the indications are they wouldn't. One of them would file a suit the next day and say, I wasn't in privity with your client. And there are also statute of limitations that would prevent, you know, continued suits for over and over. Because you've described this as an ongoing violation. So there's no statute. Well, Your Honor, there's no case law that I'm aware of that suggests that rate payers wouldn't have standing to bring a preemption clause and, in fact, a preemption claim. But if you're right, do you agree with me that it would follow that we could have these suits before us forever, until we've run out of rate payers? Well, theoretically, that is a possibility, I suppose, Your Honor. But it's notable that that hasn't happened, despite the fact that these claims have been available to litigants in the past. I have a question that I haven't been able to answer, that I really don't quite understand. There's a contract which both of the utilities entered into. My understanding is that contract set a wholesale rate. Is that correct? The contract is not entirely clear on it, but it's a wholesale rate that it set. Now, if and when this project ever gets built within the time frames it's supposed to be power to set the wholesale rate, what effect does this wholesale rate, which is set in the contract between the parties, have when FERC gets to hear and decide what the wholesale rate should be? The way FERC now sets wholesale rates in the New England market is by simply giving the seller the freedom to sell at market-based rates to whoever it finds. And what the seller does is simply reports a contractual transaction to FERC. FERC never actually reviews the underlying contract or the actual rate, unless someone brings some sort of challenge. So our contention here is that the fundamental issue here is the State's intrusion into the field. That's what we want to remedy, and that's what we'd like to enjoin. It's not to the justice and reasonableness of the price, which, if it had been entered voluntarily, we would have no objection to. Are you saying that if you made a similar argument to FERC, it would not have the authority to hear that argument? We would be able to make an argument that the contract violated the tariff that FERC may yet approve. That argument would be available, though FERC couldn't, for example, enjoin a State agency. It would lack the remedial power that a federal court has. But it wouldn't need to. It would simply not approve the rate. This is a perfect federalism exam. There are all sorts of issues about primary jurisdiction as well, including deference to the authority of FERC. Why should we intervene at this point  in time? Because the court has jurisdiction, and the basic rule is when the court has jurisdiction, it must exercise that jurisdiction. And I would point the court to the recent decisions of the Third and Fourth Circuit addressing similar preemption-type claims under the Federal Power Act. And the exact same argument was raised, that, well, you know, this may be an issue that can be raised at FERC later on, but the courts in those cases said, that may be so, but we have jurisdiction to hear the claim. But they are in both those cases, as I understand the State statute, both the cases said that no matter what the wholesale rate is that gets approved, and there it was through an auction process, you'll be required to true up to a certain contractual amount and pay on the top of that amount. So we don't have that here. Massachusetts hasn't said that at all. It simply said, as I understand it, correct me if I'm wrong, that by signing this contract, NSTAR, we're not going to claim it was unreasonable under Massachusetts law for you to do that. Therefore, you'll be able to pass on the rates. It's still up to FERC, though, whether the wholesale rates become effective. And if I understand it correctly, your response to Judge Stahl should not have been that the contract sets the wholesale rate. It should have been that the wholesale rate is set when the contract is filed with NSTAR, and the objections goes by, and FERC does not then suspend it. I think that's how it works, isn't it? It's reported within that time. That's right. And if anybody appears at FERC and argues this is an abuse of their market papers rate making authority, FERC would have jurisdiction to decide that. In the Third and Fourth Circuit cases, Your Honor, it's important to understand that the exact same argument was made, that the seller came in and said, look, all we're doing is And yes, it's a contract for a different price than the market would otherwise pay. But we don't have that here, right? In other words, NSTAR can't charge anybody a penny more than FERC approves, if I understand it correctly. But Your Honor, the point is that I mean, am I correct on that? One of your counsel, I think, would like to confer with you before you answer that question. Am I right? I don't, among yourselves, please. I'm just trying to clarify, and I might be wrong, that's why I'm asking, but as I understand it, NSTAR cannot charge a penny to anybody if FERC sets aside the contract in the tariff proceeding I've described. Your Honor, you're correct that FERC could set aside the contract in a FERC proceeding. And then NSTAR couldn't charge anyone anything, whereas in Solomon and Nazarian, no matter what the auction rate was set, the wholesale rate was set at, under the agreement mandated by the State, there would be a true-up provision that would still have to be paid. Well, Your Honor, no, because the entire basis of those cases was the notion that the true-up provision was itself a FERC jurisdictional payment. In other words, it was a payment in exchange for an electricity sale. So the exact same argument that Your Honor is suggesting could have been made in those cases. An extra payment is being made above and beyond what the market would otherwise pay for the power. In that case, it was in the form of a true-up beyond what the market revenues actually would be. In this case, it's simply the replacement of a market price altogether with a different contractual price that the State has imposed on NSTAR. In a sense, this case is a stronger case for preemption than those two other cases. In those two other cases, the sale continued to be made in the FERC market and then there was a side payment that was being made. And the argument made by the plaintiffs in those cases is that side payment is really just part of the power sale. And that was the critical issue in those cases. And the Court said, yes, we agree with that and we're going to hear that claim and we're going to regard that as preempted because it's displacing the market price that should otherwise be paid. Here, you don't have a side payment. You simply have the market move to the side altogether replaced by a contract price that the State has forced NSTAR to accept. And that's the nub of our preemption claim. There were two issues in the case. The other was the dormant Commerce Clause issue. What would you like to say about that? Well, I have just one point about that. The nub of that case is standing, of course. And the force of our opponent's argument on Commerce Clause standing is that a ruling in our favor would open the door to suits by all sorts of downstream consumers. And I would just suggest that such a broad holding is not necessary at all here. This is a rare situation. My question isn't about standing. There is no geographic limitation or disparity at this point. There once was. A Canadian company justifiably objected. That's gone. What is the geographic issue that is left? Well, it's a favoritism for a Massachusetts-based company. When the State uses its regulatory power to direct business to an in-State entity and doesn't allow out-of-State entities to compete for that business. So it's the same theory. It's a different emendation of your basic theory that there was coercion here. That's right. They both rely on the same underlying factual premise. And the fact that a State agency is trying to favor the State's interest is the geographic issue? Well, the State agency is trying to favor in-State producers and essentially capture a portion of the market for renewable energy in Massachusetts to be served by this in-State producer rather than allowing out-of-State producers located in places like New Hampshire and Maine where there is a lot of wind power to serve that market share. I understand the leverage point for the State, as I understand it, that you're pointing to was the approval of the merger. The leverage point was, that's right, it's akin to an unconstitutional conditions case. That might be the structural way to think about it. And DPU was the State agency that had the authority to approve or disapprove that. That's correct. And you're not arguing that DPU itself imposed any requirement? Well, what we're arguing is that the DOER used its involvement in the merger, it has a statutory authority to be involved in these types of decisions. It can make arguments. Pardon me? It can make arguments. It's tasked with implementing the Commonwealth's energy policy. And the conjunction of the DOER's role in that process and the DPU's approval, which was necessary for the contract to become effective, together those constitute the federal violation. They're both necessary elements in order for the contract to go into effect. Okay. Thank you. Good morning, Your Honors, and may it please the Court, Tim Casey on behalf of the State Defendants. Chief Judge Lynch, per your directive, I'll start with the merits. And our main argument, as you know, is that the central allegation in the complaint is not a fact. It is a conclusion masquerading as a fact. Specifically, the DOER used its involvement as a party in merger proceedings involving NSTAR in 2011 and 2012. Gee, I thought the DPU thought it was deciding an issue of fact. I'm sorry, Your Honor? Didn't the DPU think it was deciding an issue of fact? Well, it was responding to an argument, whether couched as a factual one or a legal one, by the alliance that DOER had taken. Aren't you better off arguing the implausibility rather than its conclusion? Well, I think it's both, Your Honor. I think in this Court's decision in the Republican Leadership Commission, the Court said that a fact is not a well-pled one if it is contradicted by documents that are relied upon in the complaint. And here, while plaintiffs may characterize what happened as coercion, the very documents that they rely upon, including DPU's merger approval order and the PPA order, indicate that there was no such coercion. But as a matter of law, you're absolutely right, Your Honor. It is not plausible where it is undermined or contradicted by the statutory limits on DOER's power. It had no power to approve the merger or the MOU or the PPA. The alliance admitted that DOER had no sovereign power in any of these proceedings. It was merely acting as a party. I understand why you're arguing that, and I'm only speaking for myself, but that's not a very attractive argument. Because regardless of what authority a legislature sets out in a statute, sometimes agencies act in a way that causes a result to happen. Now, this is tied to your, it isn't a fact, but the DPU didn't rest merely on the, they don't have the power. They rested on a finding that NSTAR entered into this voluntarily. That's correct, Your Honor. I think both are independent and adequate reasons, if you will, for why the preemption claim and the Dormant Commerce Clause claim are implausible as a matter of law. There simply wasn't enough coercion and NSTAR testified and it was established that NSTAR voluntarily entered into this contract regardless of what DOER's involvement was. So we think that either way the kind of essential ingredient in both the preemption and the Dormant Commerce Clause claim is an assertion of coercion, that the state used its regulatory decision-making power to force NSTAR into something. That's not what happened. DOER played its role as it does promoting renewable energy for the Commonwealth. It often intervenes in DPU proceedings. It acts as a party. It played its role. DPU played an entirely separate role and there's no allegation in the complaint, nor could there be, about any kind of concerted action. Instead, the plaintiffs in their reply brief suggest that the state can, and they analogize to corporate law cases, saying that a state can't divvy up its responsibilities among various agencies in an attempt to avoid collective responsibility. That's not what happened here, Your Honors. This was not a case of the state opportunistically divvying up its responsibilities in an attempt to avoid liability. This was merely about the two different state agencies exercising the powers that were There's a sort of implicit admission here that if DOER had coerced there would be a preemption claim that was validly stated. Is that the state's position? It's not. Certainly we would be closer to one. We would be closer to the situation in the Third and Fourth Circuits in Solomon and Nazarian, respectively. There, the state, and Judge Keada, you were exactly right in your characterization of those cases. There, the state legislature in New Jersey and in Maryland, their version of the DPU directed, compelled the utilities, all the utilities in those states to enter into a contract at a set price and then that and then required the utilities to bid into and clear the FERC-supervised regional auctions and they would get the price not that was dictated by the auction but instead by the state-mandated contract price. That's not what happened here. The auction would be the FERC-approved price. That's correct. Here, as we note in a submission in the addendum to our brief, DPU explicitly rejected that approach in Massachusetts. Instead, what happened is DPU merely approved NSTAR's buyer-side decision to enter into this contract. The rate is set by the contract, subject to FERC approval. And that was reiterated in the Supreme Court's decision in the Morgan Stanley case, for example. And Chief Judge Lynch and Judge Keada, I hear from your questions this notion of comedy or repose, that there was a right place and a right time to bring these claims. And our argument is this is the place that, this is the one place that is not the right place to bring those claims. They could have challenged DPU's approval decision to the state courts in Massachusetts under General Laws Chapter 25, Section 5. The Alliance knows that perfectly well since it challenged the National Grid-Cape Wind contract, making the very same argument that this was a dormant commerce clause violation, an argument the SJC rejected. There can also be FERC will receive from Cape Wind a request for market-based rate authorization. As the Morgan Stanley case discusses, there is an opportunity there for FERC to consider, for FERC to consider whether the applying the Mobile Sierra presumption that a rate set by contract is presumptively just and reasonable unless it seriously negatively impacts the consuming public. FERC will have an opportunity to consider that question at the appropriate time. But as FERC emphasized in considering a very similar challenge by a different group of individuals to the NSTAR, sorry, the National Grid-Cape Wind contract, there is a time and a place to consider that and that is in separate FERC proceedings. There's nothing problematic for FERC ruled about DPU reviewing and approving a quote-unquote retail filing, which is exactly what happened here. So as a matter of law, there will be a time and a place to consider those arguments. This is not that time and place. I have a question. I'm sort of curious about what, nothing's been built here yet. And I assume that there are estimates of what it's going to cost to build this project. Let's assume that when they actually get into the ocean and they start building that the cost estimates are totally incorrect and that there's a tremendous overrun in what it costs to put the project together. What happens then with this contract and the, do they have the ability to charge the rate payer with that excess cost over what was assumed at the time that the contracts were entered into? I don't, Your Honor. The contracting parties may be better able to answer that. But the contract rate is the contract rate, and I guess I can say this by way of answer. The contract sets a base rate and there are, it is subject to some adjustments. I don't know whether that would be the basis for an adjustment, but that would be by operation of the contract. Your Honor, as I see I'm running low on time, I do want to address briefly the ex parte Young argument. We do think that this is about a challenge to a past violation by the state, a past alleged violation, where there is no future conduct left to enjoin. DPU will take no future action with respect to the approval of the contract, and that distinguishes this case from the Verizon case out of the Supreme Court. How do you get around the Treasury issue? They're not asking, nothing they ask for will require Massachusetts under any scenario to pay a penny. Your Honor, the Supreme Court has been very clear in, for example, the Federal Maritime Commission case and Seminole Tribe, that sovereign immunity and the 11th Amendment are not just about the impact on the Treasury. They're also about subjecting the state to the indignity of a coercive suit at the instance of private parties. And this is such a case, particularly where there is no ongoing conduct left to enjoin. But then, you know, the justices have been having a huge debate for over a decade over what ex parte Young means, and the Verizon case seems to indicate a swing that goes against your interests. Do we need to decide the issue? You don't, and I know this circuit has occasionally bypassed an 11th Amendment question in favor of the merits. It could, of course, do that in this case. Your Honors, I'm sorry, I see that I'm out of time. Could I just cite two cases for the courts? Are they in your briefs? They are not. Send us a 28-J letter, please. Thank you, Your Honors. Good morning, Your Honors. David Rosenstein-Weig for Cape Wind. I would start by addressing Judge Stahl's question on the prospect of a cost overrun somehow redounding back to customers. That would not be the case here. The contract sets a specific rate, and none of the rate, no element of the rate that would be subject to FERC approval would allow for a pass-through of cost overruns that might result theoretically upon building the facility. The only rate that can be charged is the FERC approved rate, the wholesale rate, the market-based rate that Cape Wind will have to apply for within 60 days of going into service. Doesn't that contain some conditional increases above the $187? The only prospect for an increase has to do with Cape Wind's eligibility for tax credits and not building contingencies, if you will, with cost overruns. And those were agreed to at arm's length among the parties in terms of how the ITC investment tax credit or the PTC, the production tax credit under congressional policies would be flowed through under the contract. So it's a general matter. But there's no provision for reduction of the contract rate, is there? Oh, there is. There are several provisions for reductions in the contract rate if Cape Wind is able to achieve savings, if it is able to achieve a lower cost of financing through lower cost debt. Those are all one-sided in favor of rate payers. And so those would be part of the FERC approved rate as well. So I just want the record to be clear on that. Am I correct that if FERC were to withhold market-based rate authority or revoke it or not approve this contract or find it just and reasonable under any one of those four contingencies, the contract would no longer be effective? The contract would not be effective. There is a condition in the contract itself that Cape Wind obtain FERC approval for the wholesale rate, that it obtain market-based rate authority. And so under the contract itself, the contract would be null and void in that a condition precedent would not have been met. Going back to the DPU case, the record before the DPU was unrebutted. NSTAR's own senior executive testified that all of its actions leading up to this contract were voluntary. The alliance put on no evidence there in that case with regard to the voluntariness or in its words coercion that it alleges here. And so why should the alliance and the other appellants get a free shot in contesting an issue that was fully litigated at the DPU and would survive a substantial evidence test at the SJC, which is a very deferential test. Was there any reasonable evidence at all in terms of that particular item? There was very substantial evidence. There was NSTAR's own executive who testified that they, NSTAR, entered into the contract because of unique benefits that Cape Wind offered. And they explicitly said they were not coerced in a way that denied them their free will. And under Morgan Stanley, as has already been discussed, parties are freely available under federal law, under the Supremacy Clause, as according to the Supreme Court, to enter into bilateral contracts at set a rate. In terms of the voluntariness, it isn't plausible that this contract was involuntary because before this contract was entered into, there was something called an MOU, Memorandum of Understanding. And that Memorandum of Understanding, as our record reflects, was voluntarily entered into by Cape Wind in NSTAR without any compulsion or role whatsoever for DOER. There was a provision in the MOU that the DPU had to approve that said that the MOU has been freely negotiated between the parties and neither party shall be obligated to enter into a contract unless they find the terms of the contract mutually agreeable. So the agreement between Cape Wind and NSTAR itself, which had nothing to do with any DPU prior action or DOER alleged coercion, provided terms that indicated that the parties would enter into the MOU, which is a precursor under state law to entering into bilateral contract negotiations, that the MOU would go forward and a contract would go forward only if NSTAR and Cape Wind found the terms of the PPA mutually agreeable. Let me make sure I understand the chronology here. So the putative leverage point for the DOER was the DPU approval of the merger, according to plaintiff's theory. So alleged. After the merger was approved, did NSTAR still have an ability to not contract with Cape Wind? They did, Your Honor, in that before the contract would go forward and MOU had to be entered into and approved by the DPU, that MOU was entered into at arm's length between Cape Wind and DOER. But that was after merger was approved. Excuse me, NSTAR and Cape Wind. No, that was before the merger was approved. That MOU was entered into before that. But my question is after merger approval, was Cape Wind free under the controlling documents, not Cape Wind, NSTAR free not to enter into the contract? I would say by terms of the MOU and the DPU's approval of the MOU, if NSTAR did not find the terms of the PPA that they negotiated satisfactory, agreeable, it was within NSTAR's discretion not to enter into the PPA and not go forward. That's before the DPU has approved it, right? Yes, that's before the DPU. Once the DPU has approved the PPA and rejected the arguments, they are stuck. Oh, they are stuck. They are bound by the terms of the contract as approved by the DPU, which did not set the wholesale rate. DPU was very clear that that was something that was going to be handled by FERC. And I just wanted to make one other point, Your Honor. When counsel for the alliance for the appellants was asked by Judge Stearns at oral argument whether NSTAR had the discretion to freely walk away from any merger settlement that included an offshore wind component, he freely acknowledged that they could, but they wanted the merger. So that was the quid pro quo, that NSTAR got what it wanted in a merger, and then NSTAR agreed to other provisions, not just offshore wind, but it included electric vehicles, solar power, energy efficiency, rate reductions, that it might not on its own have volunteered, but in the greater good of the merger, it made its own independent business judgment that the merger settlement and the other arrangements and commitments that were in that were reasonable and they were a worthy basis to go forward. So I have a question about has anyone applied to FERC for anything as a result of the DPU approval? That would not occur, Your Honor, until approximately 60 days before the project is scheduled to go in service, which may not be for another couple of years. So that would be for another day where these parties would have the right to intervene and challenge if they wish about justness and reasonableness of the wholesale rate. Is there also a drop-dead date if you don't get the project ready to go online when the contracts end? There is, Your Honor. There are critical milestones in the contract that require ongoing progress with Cape Wind that provide a right determination that would be within NSTAR's discretion if progress is not achieved. The other comment you made was about negotiations. My understanding is that there was no negotiation on the second contract. They simply took what was already negotiated in the initial contract, and that was part of the settlement agreement with Massachusetts in order to get the merger through. That was alleged by the alliance, but, in fact, that's not true. The price is the same because NSTAR was satisfied that it was a reasonable price, but there are other contract elements that were changed that are different from the National Grid contract, and those provisions were, again, freely negotiated between Cape Wind and NSTAR. Any other questions? Just one other point, Your Honor. I know the Court has to reach an Article III determination that these plaintiffs have standing. We would rest on our brief, but we do not believe that they've demonstrated injury in fact, traceability, redressability consistent with this Court's standards and consistent with the Patch case, which, although it had to do with intervention, dealt with a generalized grievance by rate payers for particular alleged harms that might occur in the future. So we would ask the Court to make a ruling on that basis. You would. We might prefer some other ground. Fair enough. Thank you. Thank you, Your Honor. Thank you. Two more minutes. Thank you, Your Honor. Just a couple of very quick points. The first addressing the implausibility issue in light of the DPU finding. The DPU was assessing the voluntariness of this within the confines of the dilemma that the DOER had placed NSTAR into. And it's true that NSTAR's choice between one horn of the dilemma, contracting with Cape Wind or the other, foregoing its merger, could in some sense be regarded as a voluntary business judgment. But the nub of our contention is that NSTAR should not have been placed under that dilemma in the first place. And that is the sense in which this case is very much like the classical unconstitutional conditions case, where one can always say that the choice to capitulate to the State's demand is a voluntary one because you don't want to forego the privilege that the State has given you. For example, the landowner who says, okay, I'll give up part of my land to the State because I want to get my zoning variance approved. Well, that's a voluntary choice in some sense, but not in a relevant sense. So you're differentiating the coercion issue before this Court from the coercion issue before the DPU. That's right, Your Honor. And I don't think the DPU, if you read its findings, really squarely addressed the kind of coercion argument we're putting forward before this Court, which was that the choice given to NSTAR in the first place had a coercive element to it. Mr. Price, what do you make of the point that under the terms of the MOU, after it got what it really wanted, the merger approved, NSTAR could have avoided still entering into the contract. It was not contractually or legally bound to enter into the contract. The contract, I believe, was concluded before the merger was approved. So there was the chronology you have is that the MOU required them to enter into it before the merger was approved? That's right. And that was the whole concept. That's right, Your Honor. And just the last point I wanted to make, if I may, on preemption, is just that the idea of needing to go to FERC or the availability of FERC as a form for this shouldn't prevent the Court from exercising the jurisdiction the Court has. The same argument could have been made and was made in the Third and Fourth Circuit cases, and those courts recognized that this wasn't true. But they're factually distinguishable from this case. Well, again, Your Honor, in those cases, you had a power contract that was entered into by the seller in the utility, just like in this case, and there the pricing structure was you get some from the market and then you get an add-on in connection with your electricity sale from the utility. And so there was a price supplement. And here you have the replacement of the market price altogether with the contract price. And we'd submit from the preemption standpoint that's a distinction without a difference. One other question on that. Under the MOU, if NSTAR and Capewind had not reached agreement on the PPA, then was DOR free to continue opposing the merger? I don't recall offhand exactly what the term of the agreement was, but the way it was structured was to ensure that the contract negotiations were going to take place between the parties before the merger was going to be resolved. But suppose NSTAR had not reached agreement with Capewind. Could DOR then reassert the leverage that you say they had by virtue of taking a position in opposition to the merger? Nothing in the MOU would have precluded that, Your Honor. And if you look at the statements by the NSTAR CEO, he said that they entered the contract precisely to remove the kind of uncertainty that would result in that sort of circumstance. Thank you. Thank you very much.